FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Nov 30, 2017

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TINA M. CAMPBELL,<br><br>               Plaintiff,<br><br>   v.<br><br>CAROLYN W. COLVIN,<br><br>               Defendant. | NO: 2:16-CV-00348-FVS<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

BEFORE THE COURT are the parties' cross motions for summary judgment. ECF Nos. 16 and 17. This matter was submitted for consideration without oral argument. The plaintiff is represented by Attorney Joseph M. Linehan. The defendant is represented by Special Assistant United States Attorney Leisa A. Wolf. The Court has reviewed the administrative record and the parties' completed briefing and is fully informed. For the reasons discussed below, the court

**GRANTS** Defendant's Motion for Summary Judgment, ECF No. 17, and **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 16.

## JURISDICTION

Plaintiff Tina M. Campbell protectively filed for disability insurance benefits on January 15, 2013. Tr. 175-83. Plaintiff alleged an onset date of June 1, 2009. Tr. 177. Benefits were denied initially (Tr. 118-20) and upon reconsideration (Tr. 122-27). Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held before ALJ Jesse K. Shumway on April 3, 2015. Tr. 44-92. Plaintiff was represented by counsel and testified at the hearing. *Id.* Medical expert Arvin J. Klein, M.D. also testified. Tr. 53-65. The ALJ denied benefits (Tr. 17-37) and the Appeals Council denied review. Tr. 1. The matter is now before this court pursuant to 42 U.S.C. § 405(g).

## BACKGROUND

The facts of the case are set forth in the administrative hearing and transcripts, the ALJ's decision, and the briefs of Plaintiff and the Commissioner, and will therefore only the most pertinent facts are summarized here.

Tina M. Campbell ("Plaintiff") was 39 years old at the time of the first hearing. Tr. 72. Plaintiff graduated from high school and then received her AA in medical office administration from Interface College. Tr. 73. At the time of the hearing, Plaintiff lived with her husband, who was a truck driver, and their two

children aged six and eleven. Tr. 71-72. Plaintiff's work history includes insurance clerk, certified nurse assistant, sewing machine operator, administrative clerk, specimen processor, and billing clerk. Tr. 65-71, 82-83. Plaintiff testified that she was 5'10" tall and weighed 367 pounds at the time of the hearing in April 2015; and in March 2015 the record indicates she weighed 370 pounds and had a body mass index of 53.13. Tr. 72, 534-35.

Plaintiff testified that she stopped working in January 2009 due to anemia during her pregnancy; and deep vein thrombosis and pulmonary embolism after her son was born. Tr. 73-74. She further reported that the "main symptom" that prevents her from working is "constant" swelling in her right leg and foot, which causes pain and makes standing, sitting, and walking a "challenge." Tr. 74. Plaintiff testified that she spends "the majority of the day" lying down, due to the swelling; and she estimated that in an eight-hour work day she would need to be lying down, with her leg elevated up on a pillow, for "at least six, seven hours." Tr. 75-76. She can stand for 20 minutes at the most before needing to sit down; walk for 30 to 45 minutes, maybe an hour at the longest; and sit for 30 minutes to an hour before she needs to lie down and elevate her leg. Tr. 75-76, 79. She does grocery shopping while holding the cart; and struggles to do laundry because she has to climb stairs. Tr. 77-78. Plaintiff testified that she takes care of her six year old son by herself, except when he is in preschool a few hours a week. Tr. 79-80.

When she was sick right after her son was born in 2009, her family helped take care of her son, but at the time of the hearing her family helped take care of her kids and housework an average of four or five hours a week. Tr. 80-81. Plaintiff alleges disability due to Graves disease, intestinal issues, hair loss, knee injury, blood clots, coagulation disorder, knee, obesity, back, asthma, depression, migraines, neck, hip, fatty liver, and restless leg syndrome. *See* Tr. 122.

## STANDARD OF REVIEW

A district court's review of a final decision of the Commissioner of Social Security is governed by 42 U.S.C. § 405(g). The scope of review under § 405(g) is limited; the Commissioner's decision will be disturbed "only if it is not supported by substantial evidence or is based on legal error." *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1159 (quotation and citation omitted). Stated differently, substantial evidence equates to "more than a mere scintilla[,] but less than a preponderance." *Id.* (quotation and citation omitted). In determining whether the standard has been satisfied, a reviewing court must consider the entire record as a whole rather than searching for supporting evidence in isolation. *Id.*

In reviewing a denial of benefits, a district court may not substitute its judgment for that of the Commissioner. If the evidence in the record "is

susceptible to more than one rational interpretation, [the court] must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue,* 674 F.3d 1104, 1111 (9th Cir. 2012). Further, a district court "may not reverse an ALJ's decision on account of an error that is harmless." *Id*. An error is harmless "where it is inconsequential to the [ALJ's] ultimate nondisability determination." *Id*. at 1115 (quotation and citation omitted). The party appealing the ALJ's decision generally bears the burden of establishing that it was harmed. *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

## FIVE–STEP SEQUENTIAL EVALUATION PROCESS

A claimant must satisfy two conditions to be considered "disabled" within the meaning of the Social Security Act. First, the claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Second, the claimant's impairment must be "of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a five-step sequential analysis to determine whether a claimant satisfies the above criteria. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v). At step one, the Commissioner considers the claimant's work activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in "substantial gainful activity," the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(b).

If the claimant is not engaged in substantial gainful activity, the analysis proceeds to step two. At this step, the Commissioner considers the severity of the claimant's impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant suffers from "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities," the analysis proceeds to step three. 20 C.F.R. § 404.1520(c). If the claimant's impairment does not satisfy this severity threshold, however, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(c).

At step three, the Commissioner compares the claimant's impairment to severe impairments recognized by the Commissioner to be so severe as to preclude a person from engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(iii). If the impairment is as severe or more severe than one of the enumerated impairments, the Commissioner must find the claimant disabled and award benefits. 20 C.F.R. § 404.1520(d).

If the severity of the claimant's impairment does not meet or exceed the severity of the enumerated impairments, the Commissioner must pause to assess the claimant's "residual functional capacity." Residual functional capacity (RFC), defined generally as the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), is relevant to both the fourth and fifth steps of the analysis.

At step four, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing work that he or she has performed in the past (past relevant work). 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is capable of performing past relevant work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(f). If the claimant is incapable of performing such work, the analysis proceeds to step five.

At step five, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). In making this determination, the Commissioner must also consider vocational factors such as the claimant's age, education and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is capable of adjusting to other work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1). If the claimant is not capable of adjusting to

other work, analysis concludes with a finding that the claimant is disabled and is therefore entitled to benefits. 20 C.F.R. § 404.1520(g)(1).

The claimant bears the burden of proof at steps one through four above. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the analysis proceeds to step five, the burden shifts to the Commissioner to establish that (1) the claimant is capable of performing other work; and (2) such work "exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2); *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

## ALJ'S FINDINGS

At step one, the ALJ found Plaintiff has not engaged in substantial gainful activity during the period from her alleged onset date of June 1, 2009 through her date last insured of December 31, 2013. Tr. 22. At step two, the ALJ found Plaintiff has the following severe impairments: multilevel herniated lumbar discs and spinal stenosis; degenerative joint disease of the right knee; deep vein thrombosis in the right lower extremity; pulmonary embolism; asthma; and morbid obesity. Tr. 22. At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. Tr. 22. The ALJ then found that Plaintiff has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except that she could stand and walk only one hour total in an eight-hour day; she could sit

for only one hour at a time for six hours total in an eight-hour workday; she was not able to climb ladders, ropes, or scaffolds and could only occasionally climb stairs and ramps; she was not able to kneel, crawl, crouch, or balance and could only occasionally stoop; she could only occasionally operate foot controls with the right lower extremity; she could have no concentrated exposure to extreme cold, heat, wetness, and pulmonary irritants; and she could have no exposure to unprotected heights, moving mechanical parts, or vibration.

Tr. 24. At step four, the ALJ found that through the date last insured, Plaintiff was capable of performing past relevant work as an insurance clerk, administrative clerk, specimen processor, and billing clerk. Tr. 31. In the alternative, at step five, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as survey worker, mail clerk, and charge account clerk. Tr. 32-33. On that basis, the ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, from June 1, 2009, the alleged onset date, through December 31, 2013, the date last insured. Tr. 33.

## ISSUES

Plaintiff seeks judicial review of the Commissioner's final decision denying her disability benefits under Title II of the Social Security Act. ECF No. 16. Plaintiff raises the following issues for this Court's review:

1. Whether the ALJ improperly discredited Plaintiff's symptom claims;

2. Whether the ALJ properly weighed the medical opinion evidence;

3. Whether the ALJ properly considered Plaintiff's obesity at all steps of the sequential analysis, and particularly at step three; and

4. Whether the ALJ erred at steps four and five.

## DISCUSSION

### A. Adverse Credibility Finding

An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Molina*, 674 F.3d at 1112 (internal quotation marks omitted). "The claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted).

Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (internal citations and quotations omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines

the claimant's complaints." *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("[T]he ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."). "The clear and convincing [evidence] standard is the most demanding required in Social Security cases." *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

In making an adverse credibility determination, the ALJ may consider, *inter alia*, (1) the claimant's reputation for truthfulness; (2) inconsistencies in the claimant's testimony or between her testimony and her conduct; (3) the claimant's daily living activities; (4) the claimant's work record; and (5) testimony from physicians or third parties concerning the nature, severity, and effect of the claimant's condition. *Thomas*, 278 F.3d at 958-59.

Here, the ALJ found Plaintiff's impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Tr. 26. Plaintiff argues the ALJ's credibility determination "is not supported by the record." ECF No. 16 at 16-17. The ALJ listed several reasons in support of the adverse credibility finding. First, the ALJ found that the objective

evidence does not corroborate Plaintiff's alleged limitations.  Tr. 26-29.

Subjective testimony cannot be rejected solely because it is not corroborated by

objective medical findings, but medical evidence is a relevant factor in determining

the severity of a claimant's impairments. *Rollins v. Massanari*, 261 F.3d 853, 857

(9th Cir. 2001).  Here, Plaintiff testified that her "main symptom" is that her right

leg and foot swell "constant[ly];" that the swelling occurs after sitting for 30

minutes; and is "aggravated by not being in a lying position."  Tr. 25, 74-75. She

estimated that during an eight-hour workday she would need to spend six to seven

hours lying down.  Tr. 76.  Plaintiff also testified that she was able to stand for 20

minutes at the most, and only 5 to 10 minutes doing dishes before she has to lean

against the counter; can walk for 30 to 45 minutes, maybe an hour at the longest,

before she needs to stop; and has difficulty going up and down stairs.  Tr. 76-78.

However, as generally noted by the ALJ, Plaintiff's "allegations of swelling

and need to keep her leg elevated for much of the day are not supported by the

medical record, which consistently reflects unremarkable physical exams since

mid-2009."  Tr. 26.  While Plaintiff does have a history of deep vein thrombosis

("DVT"), the record indicates it "resolved with no reoccurrence before the date last

insured." Tr. 26. Plaintiff was admitted to the hospital on April 2009, and was

diagnosed with pulmonary embolus and deep vein thrombosis of the lower right

extremity.  Tr. 26, 332-42.  However, she was discharged from the hospital on

April 28, 2009; and the final treatment note related to Plaintiff's DVT diagnosis is dated May 28, 2009. Tr. 26, 330-31, 456. And, as noted in detail by the ALJ, examination findings during the adjudicatory period Plaintiff "do not reference swelling;" aside from a January 2011 visit to evaluate Plaintiff's complaints of knee pain, during which she specifically reported the pain did "not feel the same" as the DVT. Tr. 26-27 (citing Tr. 425-49). Plaintiff testified that her doctor told her that her "leg would always swell because the vein in [her] leg is stretched out;" however, as noted by the ALJ, the record does not corroborate this assertion. Tr. 26, 76. Finally, the ALJ correctly noted that while Plaintiff's DVT "likely resulted in significant limitations initially, those limitations did not last for a 12-month period." Tr. 26; *See* 42 U.S.C. § 423(d)(1)(A) (to be found disabled, a claimant must be unable to engage in any substantial gainful activity due to an impairment which "can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.)." For all of these reasons, the ALJ correctly found that Plaintiff may have "residual standing and walking limitations associated with this impairment; however, the claimant's allegations of daily swelling are not corroborated by the treatment record." Tr. 26.

As to her allegations of back pain, the ALJ notes that Plaintiff has a severe lumbar impairment; however, "she sought minimal treatment for this impairment from the alleged date of onset to the date last insured." Tr. 27. In support of this

finding, the ALJ cites MRI results from April 2009, indicating moderate to severe

decrease in the disc height at L5-S1, mild desiccation of the intervertebral discs,

mild degenerate endplate changes at T11-12, mild posterior disc bulge with

moderate central disc protrusion, mild canal narrowing with mild bilateral

subarticular recess stenosis without compression, mild right-sided foraminal

stenosis, mild degenerative changes at L3-4, and mild central canal narrowing.  Tr.

27, 501-02.  However, the record includes only a handful office visits specifically

for the treatment of lumbar back pain, only one of which was during the

adjudicatory period.  Tr. 27, 307, 441.  As noted by the ALJ, while he considered

the objective evidence of Plaintiff's lumbar impairment in determining the RFC;

Plaintiff's allegations "primarily focused on her right knee."  Tr. 27.  As with her

alleged back pain, the ALJ notes objective MRI and x-ray testing of Plaintiff's

knee, which showed: mild subluxation of the femur on the tibia; full thickness

cartilage lesion on the medial femoral condyle, and partial thickness cartilage

lesion on the lateral tibial plateau.  Tr. 27, 360, 444. However, despite Plaintiff's

report that she originally injured her knee over 20 years ago, the treatment record

for Plaintiff's right knee impairment is minimal, spanning only January and

February of 2011.  Tr. 360-63, 443-46.  In January 2011, Dr. Wallace reviewed x-

ray and MRI results, examined Plaintiff and found decreased patellar mobility,

slight tenderness, and mild effusion; and recommended starting with physical

therapy which would "hopefully" allow Plaintiff to exercise and lose weight.  Tr.

360.  In February 2011, Dr. Peterson noted in a letter that he prescribed

medication, recommended Plaintiff continue with therapy, and noted she had a

"difficult problem" in which "weigh loss is just absolutely essential."  Tr. 28, 361.

Notably, the ALJ also cited physical therapy notes indicating that Plaintiff's knee

responded well to physical therapy.  Tr. 366, 380; *See Morgan v. Comm'r of Soc.*

*Sec. Admin.*, 169 F.3d 595, 599-600 (9th Cir. 1999) (ALJ may rely on effectiveness

of treatment to support an adverse credibility finding).

Plaintiff generally argues that her "symptoms are supported by objective

medical imaging and evaluations, as well as testimony of her husband and the

reports to medical providers."  ECF No. 16 at 16.  She also argues, without citation

to the record, that Plaintiff "experienced increased back pain and ambulatory

issues" at physical therapy.  *Id*.  However, regardless of evidence that could be

interpreted more favorably to the Plaintiff, the ALJ properly relied on substantial

evidence, as discussed in detail above, supporting his finding that Plaintiff's

claimed limitations were not consistent with the overall medical record.  *See*

*Thomas*, 278 F.3d at 958-59 ("If the ALJ finds that the claimant's testimony as to

the severity of her pain and impairments is unreliable, the ALJ must make a

credibility determination … [t]he ALJ may consider testimony from physicians

and third parties concerning the nature, severity and effect of the symptoms of

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT ~ 15

which the claimant complains."); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("[W]here evidence is susceptible to more than one rational interpretation, it is the [Commissioner's] conclusion that must be upheld."). The inconsistency between "constant" swelling and resulting limitation in her ability to sit and stand, and the objective evidence; was a clear and convincing reason, supported by substantial evidence, for the ALJ to find Plaintiff was not entirely credible.

Second, the ALJ noted that Plaintiff "did not follow through with recommendations by treatment providers, including physical therapy and weight loss, which suggests that the symptoms may not have been as serious as has been alleged in connection with this application." Tr. 27. Unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment may be the basis for an adverse credibility finding unless there is a showing of a good reason for the failure. *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007). First, Plaintiff argues the ALJ improperly discredited Plaintiff for failing to follow her doctor's advice to lose weight. ECF No. 16 at 17. The Court agrees. According to SSR 02–1p, a Plaintiff's failure to lose weight is relevant only if there is clear and convincing evidence that a prescribed weight loss treatment would be effective. SSR 02–1p (September 12, 2002), *available at* 2002 WL 34686281 at *9; *see also Orn,* 495 F.3d at 637–38 ("failure to follow treatment for obesity tells us little or nothing about a claimant's credibility"). The record does contain one treatment

note for "dietary intervention for [Plaintiff's] obesity;" which includes diet and exercise goals. Tr. 425-26. However, this single note does not rise to the level of clear and convincing evidence that this treatment for Plaintiff's obesity "would be successful" as required under SSR 02-1p. SSR 02–1p at *9. Thus, Plaintiff's failure to lose weight was improperly considered as part of the ALJ's credibility analysis. Moreover, the only evidence cited by the ALJ to support the finding that Plaintiff failed to follow through with physical therapy was a notation in the record indicating she "did not return to physical therapy after March 16, 2011, and only attended eleven visits." Tr. 28 (citing Tr. 365). However, the ALJ does not cite a corresponding recommendation from Plaintiff's treating providers, including the physical therapist, indicating that further physical therapy was prescribed at that time. Plaintiff's "discharge summary" notes she was discharged to perform a home program; as opposed to any non-compliance with the treatment plan. Tr. 355-56. For all of these reasons, this was not a clear and convincing reason to find Plaintiff not credible. However, any error is harmless because, as discussed in detail herein, the ALJ's ultimate credibility finding is adequately supported by substantial evidence. *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008).

Finally, the ALJ found Plaintiff's activities of daily living during the adjudicatory period "do not support [Plaintiff's] allegations of lying down most of

the day and significant limitations in sitting, standing, and walking." Tr. 29.  It is

well-settled that a claimant need not be utterly incapacitated in order to be eligible

for benefits. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Orn*, 495

F.3d at 639 ("the mere fact that a plaintiff has carried on certain activities…does

not in any way detract from her credibility as to her overall disability."). However,

as in this case, even where activities "suggest some difficulty functioning, they

may be grounds for discrediting the [Plaintiff's] testimony to the extent that they

contradict claims of a totally debilitating impairment." *Molina*, 674 F.3d at 1113.

As noted by the ALJ, in February 2013, Plaintiff reported that she fed her children,

took her daughter to school, allowed her son to play, fixed lunch, did dishes, got

the children ready for bed, got out daily, drove a car, shopped for groceries, and

could lift 15-20 pounds.  Tr. 238-42. She did "limited amounts" of housework,

including: laundry, dishes, vacuuming, dusting, wiping down counters, and

preparing simple meals. Tr. 239. Plaintiff also reported going to her daughter's

school and friends' homes regularly, RV camping two to four times a year, and

doing sewing and art projects occasionally. Tr. 241. Finally, as noted by the ALJ,

"while it is reasonable to assume" that Plaintiff needed help with her newborn baby

when she was diagnosed with DVT in 2009; Plaintiff testified that her family was

only helping her four to five hours a week at the time of the hearing, and her

function report did not indicate she needed help caring for her children.  Tr. 30, 81;

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT ~ 18

*Rollins*, 261 F.3d at 857 (Plaintiff's ability to care for young children without help may undermine claims of totally disabling pain). Plaintiff argues that "simply because [Plaintiff] does some housework does not mean that she is exaggerating her symptoms." ECF No. 16 at 16-17. However, Plaintiff's extensive daily activities outlined above, including caring for her young daughter without assistance; was reasonably considered by the ALJ as inconsistent with Plaintiff's complaints of entirely disabling limitations. This was a clear and convincing reason to find Plaintiff was not entirely credible.

Overall, the ALJ provided specific, clear and convincing reasons for rejecting Plaintiff's symptom claims.

**B. Medical Opinions**

There are three types of physicians: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant [but who review the claimant's file] (nonexamining [or reviewing] physicians)." *Holohan v. Massanari,* 246 F.3d 1195, 1201–02 (9th Cir.2001)(citations omitted). Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's. *Id.* If a treating or examining physician's opinion is uncontradicted, the ALJ may reject it only by offering "clear and convincing

reasons that are supported by substantial evidence." *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir.2005). Conversely, "[i]f a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (citing *Lester,* 81 F.3d at 830–831). "However, the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings." *Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1228 (9th Cir. 2009)(quotation and citation omitted). Plaintiff argues the ALJ committed reversible error by improperly rejecting the opinion of treating physician Dr. Jeffrey Jamison. ECF No. 16 at 18.

In March 2015, treating physician Dr. Jeffrey Jamison opined that, in an eight-hour work day, Plaintiff could sit for a total of two hours, stand for a total of one hour thirty minutes at a time, and walk for a total of one hour at a time. Tr. 529. In support of this assessment, Dr. Jeffrey referenced "on and off clotting of the circulatory system of the leg. Multiple DVT history and post/intra clot pain, decreased ambulation and mobility. Also, significant low back pain with spinal DJD." Tr. 529. Dr. Jamison further opined that Plaintiff cannot travel without a companion for assistance; cannot walk a block at a reasonable pace on rough or uneven surfaces; and cannot climb a few steps at a reasonable pace with the use of

a single handrail. Tr. 533. The ALJ granted Dr. Jamison's opinion little weight. Tr. 30. Because his opinion was contradicted by medical expert Dr. Arvin Klein, the ALJ was required to provide specific and legitimate reasons for rejecting Dr. Jamison's opinion. *Bayliss*, 427 F.3d at 1216.

Initially, the ALJ noted that Dr. Jamison's opinion in 2015 was "almost 1 ½ years after the date last insured;" and Dr. Jamison "said these limitations started in 2009, but [he] himself did not have substantial knowledge of the claimant's severe impairments upon which to base an opinion. After reviewing the Columbia Medical Associates treatment records prior [to] the date last insured, it appears Dr. Jamison saw the claimant very few times and most of the treatment notes were signed by a nurse or physician assistant." Tr. 30-31. In weighing Dr. Jamison's opinion, the ALJ properly considers factors including the "length of the treatment relationship and the frequency of examination," and the "nature and extent of the treatment relationship." 20 C.F.R. § 416.927(c). However, the Court's review of the record indicates that while the treatment record is not voluminous, Dr. Jamison "signed" treatment notes consistently throughout the adjudicatory period; and participated in treating Plaintiff for ailments including back pain, knee pain, and DVT. *See* Tr. 428, 439, 441, 444-46. Moreover, Dr. Jamison received letters from specialists he referred Plaintiff to for her knee pain, and was copied on treatment records from the hospital particularly pertaining to Plaintiff's DVT. *See* Tr. 330-

38, 360-63.  Finally, it was incongruous for the ALJ to give significant weight to nonexamining medical expert Dr. Klein, who never personally examined Plaintiff; while simultaneously discounting Dr. Jamison's opinion allegedly based on infrequent examinations.  As argued by Plaintiff, "[i]f Dr. Jamison is to be discredited for a lack of participation in [Plaintiff's] case, the same should hold true for Dr. Klein, who never evaluated [Plaintiff]."  ECF No. 16 at 18.  Thus, the ALJ's rejection of Dr. Jamison's opinion based on an alleged lack of treatment history is not supported by substantial evidence.  However, this error is harmless, because, as discussed below, the ALJ's ultimate finding regarding Dr. Jamison's opinion is adequately supported by substantial evidence.  *Carmickle*, 533 F.3d at 1162-63.

While unchallenged by Plaintiff, the ALJ offered two additional reasons for granting Dr. Jamison's little weight.  *See Carmickle*, 533 F.3d at 1161 n.2 (Court may decline to address issues not raised with specificity in Plaintiff's briefing).  First, the ALJ found "Dr. Jamison's physical findings on examination were generally unremarkable and certainly disproportionate to the limitations in this report."  Tr. 31.  The discrepancy between treating provider Dr. Jamison's clinical notes, which documented largely benign objective findings aside from the treatment of Plaintiff's DVT in 2009; and the severity of his medical opinion, is a specific and legitimate reason for the ALJ to not rely on that opinion regarding the

claimant's limitations. *See Bayliss*, 427 F.3d at 1216. Second, the ALJ correctly

noted that Dr. Jamison "misstated [Plaintiff's] history of blood clots. He said

[Plaintiff] had 'on and off clotting of the circulatory system of the leg. Multiple

DVT history …' Yet, the record reflects one episode of deep vein thrombosis." Tr.

31. The consistency of a medical opinion with the record as a whole is a relevant

factor in evaluating that medical opinion. *Orn*, 495 F.3d at 631; *see also Batson v.

Comm'r, Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may

discredit treating physicians' opinions that are conclusory, brief, and unsupported

by the record as a whole or by objective medical findings). The ALJ correctly

notes that the treatment record during the adjudicatory period only reflects one

DVT episode, and does not include objective evidence of ongoing treatment for

circulatory symptoms. Tr. 26-27, 31, 330-42, 456.

The Court finds the ALJ offered specific and legitimate reasons, supported

by substantial evidence, to grant Dr. Jamison's opinion less weight.

**C. Obesity**

Plaintiff contends that while the ALJ "acknowledged" Plaintiff's obesity,

"he failed to apply the facts of [Plaintiff's] case when making his determination in

Steps 3, 4, and 5, and [RFC]." ECF No. 16 at 12. As per SSR 02-1p, the ALJ

must consider the effects of obesity when evaluating disability, and particularly the

combined effect of obesity with other alleged impairments, at all applicable steps

of the sequential evaluation process. *See* SSR 02-1p. However, the claimant must point to "evidence of functional limitations due to obesity which would have impacted the ALJ's analysis." *Burch*, 400 F.3d at 683-84. Here, the ALJ specifically noted that he considered Plaintiff's obesity, in accordance with SSR 02-1p, at step three, step four, and step five of the sequential evaluation. Tr. 24. The ALJ recognized that in February 2013 Plaintiff had a body mass index of 47.42; found "morbid obesity" was a severe impairment at step two; and considered medical evidence regarding Plaintiff's obesity in assessing the RFC, including Dr. Wallace's finding that "a lot of her problems were caused by her weight." Tr. 22, 27-28, 360-61, 426. Here, as noted by Defendant, Plaintiff does not cite "any evidence in the record that [Plaintiff's] obesity caused any functional limitations *that the ALJ did not consider*." ECF No. 17 at 15 (emphasis added). Moreover, Plaintiff's treating physician Dr. Jamison did not identify obesity among the "particular medical or clinical findings" in support of his opined limitations; and Plaintiff's own testimony did not identify obesity as creating or exacerbating any specific functional limitations. *See* Tr. 528-33. Thus, due to Plaintiff's failure to set forth, and the Court's inability to discern, evidence of specific functional limitations as a result of her obesity; the Court finds the ALJ adequately considered Plaintiff's obesity at steps four and five, and in his assessment of the RFC.

More specifically, Plaintiff argues that the ALJ erred at step three in considering whether one of Plaintiff's alleged impairments, in combination with obesity, meets or equals the requirements of a listing.  ECF No. 16 at 12-16.  The Listing of Impairments "describes each of the major body systems impairments [which are considered] severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education or work experience."  20 C.F.R. § 404.1525. "To *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim. To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment."  *Tackett*, 180 F.3d at 1099 (internal citations omitted) (emphasis in original).  Further, as explained, in detail, by the ALJ in this case:

> 'Obesity' itself is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic disease of the cardiovascular, respiratory, and musculoskeletal body systems…. 'Obesity' may be a factor in both 'meets' and 'equals' determinations at step 3 of the Sequential Evaluation, the listings. Since there is no longer a specific listing for obesity, a claimant with obesity 'meets' the requirements of a listing if he or she has another impairment that, by itself, meets the requirement of a listing. A listing is also met if there is an impairment that, in combination with obesity, meets the requirements of a listing.

> However, I cannot make assumptions about the severity or functional effects of obesity combined with other severe impairments. Obesity in combination with another impairment may or may not increase the severity or functional

limitation of other impairments, but must be supported on a case-by-case basis on the information in the record. I have given consideration to the fact that obesity can cause limitation of function. An individual may have limitations in any of the exertional functions such as standing, walking, lifting, etc. It also may affect ability to do postural functions such as climbing, stooping, kneeling, or crawling. The ability to manipulate may be affected by the presence of fatty tissue in the hands and fingers. The functions likely to be limited depend on many factors, including where the excess weight is carried.

Tr. 24; *See also* SSR 02-1p. The claimant bears the burden of establishing she meets or equals a listing. *Burch*, 400 F.3d at 683.

First, Plaintiff argues the ALJ erred by finding Plaintiff does not equal Listing 1.02A for major dysfunction of her knee joint, when combined with obesity, and "especially when combined with her degenerative back disease."[1] ECF No. 16 at 14-15. Listing 1.02A requires that a claimant show major dysfunction of joints due to any cause, but characterized by "a gross anatomical deformity" "with chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate

---

[1] Plaintiff does not argue with specificity in her briefing that Plaintiff's degenerative disc disease, standing alone, equals or meets the characteristics of listing 1.04 for disorders of the spine. *See* ECF No. 16 at 14-15; *Carmickle*, 533 F.3d at 1161 n.2 (Court may decline to address issues not raised with specificity in Plaintiff's briefing).

medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)," with "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02A. According to 1.00B2b, an "inability to ambulate effectively" means "an extreme limitation of the ability to walk;" and examples of ineffective ambulation include, but are not limited to, (1) "the inability to walk without the use of a walker, two crutches or two canes" and (2) "the inability to walk a block at a reasonable pace on rough or uneven surfaces." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1)-(2).

Here, the ALJ found Plaintiff's symptoms did not meet or medically equal the requirements of listing 1.02A because there "is no evidence the claimant has an extreme limitation of the ability to walk or is not capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." Tr. 23. The Court agrees. Plaintiff generally argues that her ability to ambulate is "affected;" however, in support of this argument Plaintiff cites her own properly discredited testimony regarding her limitations in standing and walking, as discussed in detail above. ECF No. 16 at 14. In addition, Plaintiff argues listing 1.02A is equaled "when [her] obesity is factored in," because Dr. Peterson and Dr. Wallace "opined that [her] obesity made her knee impairment worse." ECF No. 16

at 14-15. These medical providers generally opined, respectively, that Plaintiff was not a good candidate for surgery due to her weight; and that "a lot of her problems are due to her weight and that any weight she could lose would help with her knee pain." Tr. 360-61. However, neither medical provider opined that Plaintiff's obesity, combined with her knee injury and/or her degenerative disc disease, limited her ability to ambulate. *See Tackett*, 180 F.3d at 1100 (a generalized assertion of functional problems is not enough to establish disability at step three). Moreover, as cited by the ALJ, Plaintiff reported that she could travel without a companion; and does not use a hand-held assistive device for walking. Tr. 23, 54-56, 505. For all of these reasons, the Court finds Plaintiff failed to meet her burden of establishing that her knee impairment, alone, or in combination with his obesity and/or degenerative disc disease, meets or medically equals listing 1.02A. *See Burch*, 400 F.3d at 683.

Second, Plaintiff argues the ALJ erred by finding Plaintiff does not equal Listing 4.11A, when combined with obesity. ECF No. 16 at 15. Listing 4.11A requires that a claimant show "chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system;" and "extensive brawny edema (see 4.00G3) involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.11(A). According to 4.00G3,

"brawny edema" is defined as "swelling that is usually dense and feels firm due to the presence of increased connective tissue; it is also associated with characteristic skin pigmentation changes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(G)(3). The ALJ found "no evidence" that Plaintiff's DVT and pulmonary embolism, diagnosed and treated in 2009, met or medically equaled listing 4.11. Tr. 23. As noted by Defendant, Plaintiff's briefing appears to concede that she "has not been treated frequently for this impairment after her initial diagnosis;" and acknowledges that "brawny edema" has not been diagnosed, nor is her swelling "as severe as described in the listing." ECF No. 17 at 18 (citing ECF No. 16 at 15). Despite these concessions, Plaintiff argues that her future "risk for reoccurrence of blockage from DVT" and "increased threat of blockage" due to her obesity is sufficient to meet equal Listing 4.11A. However, aside from Plaintiff's own reports of "painful swelling of her legs and feet which indicate an edema similar to what she experienced in 2009;" she does not identify any evidence of "symptoms, signs, and laboratory findings" to establish that her alleged impairments, in combination with obesity, met or equaled the characteristics of Listing 4.11A during the relevant adjudicatory period. Aside from the DVT episode in 2009, the Court notes only one objective finding of swelling or edema in the medical record in January 2011, at which time Plaintiff specifically reported that the knee pain symptoms she was seeking treatment for "[did] not feel the same" as her DVT and

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 29

pulmonary embolus. *See* Tr. 445-46. Moreover, the medical expert at the hearing testified that, according to the record, Plaintiff's blood clot was a "one-time thing," and he did not "see any residual functional limitations" from her DVT. Tr. 63-64. The Court finds Plaintiff has not met her burden to establish that her single documented DVT episode in 2009 meets or equals listing 4.11A.

For all of these reasons, the Court finds the ALJ's consideration of Plaintiff's obesity, at all steps of the sequential analysis, is free of legal error and supported by substantial evidence.

## D. Steps Four and Five

The RFC is an assessment of claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, *available at* 1996 WL 374184. A "regular and continuing basis" means "8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* First, Plaintiff argues the hypothetical proposed to the vocational expert at the hearing accounts for only 7 hours out of an 8 hour day; and thus "there is no evidence under Step 4 or Step 5 that a 7 hour [sic] a day with regular breaks is equivalent to an 8 hour workday or a 40 hour work week." ECF No. 16 at 20. The hypothetical at issue assumed an individual "is capable of a full range of light work with the following exceptions: standing and walking is limited to one hour a day. Sitting is limited to one hour at a time, six hours total in a day." Tr. 84. This

hypothetical appears to be based, at least in part, on the testimony of Dr. Arvin J. Klein, the medical expert at the hearing, confirming that Plaintiff was limited to "standing, walking, one to two hours," one hour at a time; and sitting for six hours, one to two hours at a time. Tr. 58-59. The Court also notes that Plaintiff's attorney did not object to this hypothetical at the hearing; and, in fact, Plaintiff's attorney proposed to "build[] off the [ALJ's] first hypothetical … this individual in a total of an eight-hour day could sit for two hours, stand for one hour, and walk for one hour."  Tr. 86. Thus, while it was perhaps clumsily phrased at the hearing, the Court finds the hypothetical proposed to the vocational expert, in the full context of the record, properly assumed an individual capable of doing sustained work activity on a regular and continuing basis as required by SSR 96-8p; and contained the limitations reasonably identified by the ALJ and supported by substantial evidence in the record. *See Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) ("If the record does not support the assumptions in the hypothetical, the vocational expert's opinion has no evidentiary value.").

Finally, Plaintiff argues that the assessed RFC "fails to account for the combine effects of obesity and the medical source statement from Dr. Jamison." ECF No. 16 at 20. However, as discussed in detail above, the ALJ's rejection of Dr. Jamison's opinion, and his consideration of the combined effects of obesity at

each step of the sequential analysis, were legally sufficient and supported by substantial evidence. The ALJ did not err at steps four and five.

## CONCLUSION

A reviewing court should not substitute its assessment of the evidence for the ALJ's. *Tackett*, 180 F.3d at 1098. To the contrary, a reviewing court must defer to an ALJ's assessment as long as it is supported by substantial evidence. 42 U.S.C. § 405(g). As discussed in detail above, the ALJ provided clear and convincing reasons to discount Plaintiff's symptom testimony, properly weighted the medical opinion evidence, properly accounted for the combined effects of obesity at all steps of the sequential analysis, and did not err at steps four and five. After review the court finds the ALJ's decision is supported by substantial evidence and free of harmful legal error.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for Summary Judgment, ECF No. 16, is **DENIED**.

2. Defendant's Motion for Summary Judgment, ECF No. 17, is

**GRANTED**.

The District Court Executive is hereby directed to enter this Order and provide copies to counsel, enter judgment in favor of the Defendant, and **CLOSE** the file.

**DATED** November 30, 2017.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 32

_s/Fred Van Sickle_
Fred Van Sickle
Senior United States District Judge